UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| GRANT STERMAN, AHMED AMIN, MAXIMO MOYER, ANDREW WEI, RAGHAV PEMMIREDDY, DECLAN MCCARTHY, JOHN PAUL CHAMPA, ALEXA JACOBS, DANIELLE BENSTOCK, LILY SECKENDORF, ABBY DICHTER, RACHEL MASHEK, KATE DOWLING, and ISABELLA KEARNS, Plaintiffs, v. BROWN UNIVERISTY, Defendant. | C.A. No. 20-358-JJM-PAS |

## ORDER

JOHN J. MCCONNELL, JR., Chief United States District Judge.

This dispute arises from Defendant Brown University's ("Brown") decision to transition its men's and women's varsity squash teams to club status.  Plaintiffs sued Defendant for breach of contract (Count I), promissory estoppel (Count II), fraudulent and negligent misrepresentation (Counts III and IV), and breach of fiduciary relationship (Count V).  ECF No. 14.  Plaintiffs seek a preliminary injunction from the Court to enjoin Defendant's action, ECF No. 16, and Defendant moves to dismiss all five counts under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 32.

This Court finds that there is little likelihood of success on the merits of any of Plaintiffs' causes of action and therefore denies the request for a preliminary injunction. The Court however, considering the liberal pleading requirements and accepting all well-pleaded plausible allegations in the Amended Complaint as true, finds that two counts survive Defendant's Motion to Dismiss.

## I.   JURISDICTION

Plaintiffs bring this suit under this Court's diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a). Brown has moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs have failed to establish that the amount in controversy exceeds the $75,000 threshold required for diversity jurisdiction. ECF No. 32 at 10-12.

"It is well-settled that in an action for injunctive or declaratory relief 'the amount in controversy is measured by the value of the object of the litigation.'" *Grotzke v. Kurz*, 887 F. Supp. 53, 55 (D.R.I. 1995) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977)). When the value is in dispute, "the party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount." *Dep't of Recreation and Sports of Puerto Rico v. World Boxing Ass'n*, 942 F.2d 84, 88 (1st Cir. 1991).

Here, Plaintiffs have sufficiently demonstrated "that the pecuniary consequences of [this] judgment might crest $75,000." *Maine Cmty. Health Options v. CVS Pharmacy, Inc.*, No. CV 20-10-JJM, 2020 WL 1130057, at *2 (D.R.I. Mar. 9,

2020). As they point out, Brown's total expense for its men's and women's varsity squash teams in 2018 was $303,518. ECF No. 36 at 2. Brown is correct that this figure does not represent the amount in controversy, as the university would still incur expenses running club squash teams. ECF No. 37 at 4. However, it is far from legally certain that the expenses associated with four years of varsity squash, compared to club squash, are less than $75,000. Consequently, the Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332, and Brown's 12(b)(1) Motion is denied.

## II.   BACKGROUND

Brown's men's and women's squash teams have historically competed in Division I varsity athletics, playing in the Ivy League and the College Squash Association. ECF No. 14 at 1. Both teams consist of a mixture of students who joined after enrolling at Brown, as well as students who matriculated at Brown anticipating participation on the team. The latter students were in contact with Brown Athletics throughout their college application process – receiving either a recruitment offer ("Recruited Plaintiffs") or some form of support in their application ("Supported Plaintiffs"). *Id.* at 5.

Brown has a limited number of recruitment spots that its squash coach can offer to high school students. Beginning in their junior years of high school, high-achieving squash players correspond with Brown's squash coach – learning more about Brown and its squash program, and in turn updating the university on their academic and athletic achievements. *Id.* By the spring or summer of their junior

years, recruited students will receive a recruitment offer from the Brown squash coach. If accepted, the understanding is that – pending review by Brown Admissions – the student will be accepted to Brown and will plan to matriculate and play on the squash team. *Id.* at 6.

It is common for recruited students to be considered by multiple universities. Per Ivy League rules and norms, upon accepting their offer they will generally remove themselves from consideration at other universities – informing other squash coaches of their recruitment and often applying Early Decision to Brown. *Id.* at 7-12. Students who did not receive a recruitment offer may still receive support in their application to Brown (e.g., a recommendation letter by the coach). *Id.* at 13. Following review by the Admission Office, recruited students receive a "Likely Letter" in the Fall of their senior years, indicating that they can expect to be admitted. *Id.* at 14.

The recruitment process involved ongoing conversations between Plaintiffs and Brown squash coach Stuart leGassick throughout Plaintiffs' junior and senior years of high school. *Id.* at 7-14. During 2016-2019, Coach leGassick offered recruitment spots to each Recruited Plaintiff. The offers varied in language, but generally explicitly offered Plaintiffs a recruiting spot and asked them to respond by informing the coach whether they would be accepting. *Id.* at 7-12. Offers often included statements attesting to the student's potential to thrive as a student-athlete at Brown, and sometimes used terms such as "four years" and "varsity," but other times did not. Following the offers, Recruited Plaintiffs sent emails accepting, and,

4

often at Coach leGassick's instruction, notified other universities with whom they were in contact of their decision. They then applied Early Decision to Brown, received "Likely Letters" from Brown's Admission Office, and ultimately matriculated at Brown. *Id.* at 7, 12.

Similar exchanges, while not offering recruitment spots, occurred between Coach leGassick and the Supported Plaintiffs. In conversations with Supported Plaintiffs, Coach leGassick offered to support their applications for admission to Brown and were told that if they were accepted, they would be able to play on the team. *Id.* at 13-14. Supported Plaintiffs subsequently matriculated at Brown. *Id.* at 15.

On May 28, 2020, Brown announced its intention to transition its men's and women's varsity squash teams, along with nine other varsity teams, to club status immediately.[1] *Id.* at 19. Brown's Athletic Director Jack Hayes announced the decision during a Zoom call with student-athletes. Before the call, Plaintiffs did not know that Brown was considering transitioning varsity squash to club status. *Id.*

According to Brown, the decision to transition its squash teams to club status was part of a broader effort to improve the school's athletic competitiveness, called the Excellence Initiative to Reshape Athletics at Brown. The decision was the culmination of the work of the Committee on Excellence in Athletics, which President Christina Paxson formed in January 2020. In March 2020, she charged the

---

[1] Brown also announced it was creating two new varsity teams – women's and co-educational sailing. Since the announcement, Brown has reinstated several teams to varsity status. ECF No. 34 at 47.

Committee with making recommendations on how Brown might enhance the quality of the student-athletic experience at the school. ECF No. 35 at 6. Ultimately, the process produced a revised proposal that called for transitioning eleven varsity teams, including squash, to club. On May 21, 2020, the Corporation – Brown's highest governing body – approved the proposal. *Id.* Brown notified the coaches of the affected teams, including Coach Stuart leGassick, of the decision shortly before they announced it to student-athletes. *Id.* at 7.

Preceding the announcement, and certainly in the months since, the COVID-19 pandemic has ravaged the globe. Accordingly, most intercollegiate squash competitions have been cancelled for the foreseeable future. *See NESCAC Presidents' Statement on Winter Sports*, NESCAC (Oct. 8, 2020), https://nescac.com/news/2020/10/8/nescac-news-nescac-presidents-statement-on-winter-sports.aspx; *Ivy League Outlines Intercollegiate Athletics Plans; No Competition for Winter Sports*, Ivy League (Nov. 12, 2020), https://ivyleague.com/news/2020/11/12/general-ivy-league-outlines-intercollegiate-athletics-plans-no-competition-for-winter-sports.aspx. While Brown allowed some in-person training for varsity teams earlier in the Fall 2020 semester, as of November 15th all university in-person practice activities have been halted indefinitely in response to rising COVID-19 case numbers. ECF No. 35 at 10.

## III.   STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs must plead a "plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). The

complaint must have sufficient factual allegations that plausibly state a claim upon which relief can be granted. This standard requires more than a recitation of elements and must allow the Court to draw a reasonable inference that a defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept a plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009).

The First Circuit has stated that the issuance of a "preliminary injunction is an extraordinary and drastic remedy, that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and internal quotation marks omitted). In determining whether to issue a preliminary injunction, the Court must consider these four factors: (1) the likelihood that plaintiffs will succeed on the merits of their claims; (2) the possibility that, without an injunction, the plaintiffs will suffer irreparable harm; (3) the balance of relevant hardships as between the parties; and (4) the effect of the Court's ruling on the public interest. *Waldron v. George Weston Bakeries, Inc.*, 570 F.3d 5, 9 (1st Cir. 2009). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [they are] likely to succeed in [their] quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

The burden of proof on these elements is on the moving party. "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility'

of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## IV. DISCUSSION

The Court will use the framework of the factors required to issue an injunction, and deal with Defendant's Motion to Dismiss within the Court's analysis of the likelihood of success for each count.

### A. Likelihood of Success

#### a. Breach of Contract (Count I)

In Rhode Island, forming a valid contract requires "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." *DeAngelis v. DeAngelis*, 923 A.2d 1274, 1279 (R.I. 2007) (citing *R.I. Five v. Med. Assocs. of Bristol Cty., Inc.*, 668 A.2d 1250, 1253 (R.I. 1996)). Plaintiffs argue that Brown's decision to transition the squash teams to club status violates the terms of the contracts they allege were formed between them and the school through the recruitment process. ECF No. 14 at 21. Brown moves to dismiss, arguing that nothing in Plaintiffs' Amended Complaint "supports a plausible allegation that Brown promised to maintain varsity squash teams for the entirety of Plaintiffs' college careers." ECF No. 32 at 20. Further, they argue against court intervention, citing the legal proposition that "[c]ourts normally construe educational contracts to allow the school administration flexibility in meeting its educational responsibilities." *Id.* at 16 (quoting *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004)).

*Motion to Dismiss*

Plaintiffs' Amended Complaint sufficiently alleges each of the elements of a claim for breach of contract regarding the recruitment agreements. ECF No. 14 at 21. They allege that Coach leGassick, on behalf of Brown, offered them recruitment spots (either formally for Recruited Plaintiffs, or by promising Supported Plaintiffs application support and a spot on the team should they be admitted), which they accepted. Particularly given the norms of the recruitment process, they aver that the recruitment agreements amounted to a mutual agreement – they would matriculate to Brown, and in turn Brown would guarantee them four years on a varsity squash team.   In reliance on the offers, they committed to Brown, while forgoing opportunities at other universities.   While they fulfilled their obligation to matriculate (and decline other opportunities), Plaintiffs assert that Brown violated its obligation to provide them with the promised varsity squash opportunities. *Id.* at 21.

Interpreted in the light most favorable to Plaintiffs, the Amended Complaint includes sufficient allegations of breach of contract to survive Defendant's 12(b)(6) motion. *See id.* at 12, ¶ 55 ("The Recruited Plaintiffs committed to Brown in reliance that they would have four years of squash, and they enrolled at Brown each year based on Brown's ongoing representations about the continuance of its varsity squash program."). The veracity of Plaintiffs' allegation that the recruitment agreements guaranteed four years of varsity squash is a question of fact for a later stage of litigation. *See, e.g., Doe v. Brown Univ.,* 166 F. Supp. 3d 177, 195 (D.R.I. 2016) ("It

will be a question of fact for down the road whether a student would reasonably expect to be given more time to prepare a response based on the Code's promise of a 'reasonable length of time.'").  Even with the principle of academic freedom in mind, this Court may still review university actions to ensure they comply with enforceable contracts made with students. *See Havlik v. Johnson &Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) ("We interpret such contractual terms in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them.").  Plaintiffs satisfactorily allege the formation of a contract, contending that the recruitment agreements between Plaintiffs and Brown included a promise of four years of varsity squash and satisfied all the elements necessary to form an enforceable contract – offer, acceptance, and consideration.  The Motion to Dismiss Count I is thus DENIED.

*Preliminary Injunction*

Now the question becomes, based on all the evidence presented at the preliminary injunction hearing, whether this Court concludes that the Plaintiffs are likely to succeed at trial.  After a review of the evidence submitted for consideration at the hearing, the Court concludes that Plaintiffs will probably not succeed on the merits of this claim.  The evidence does not support a finding that Brown offered Plaintiffs a contract to play varsity sports for four years.  As Brown correctly argues, Plaintiffs "cannot point to any evidence that Brown made a specific, enforceable promise that they would get to play four years of varsity squash at Brown." ECF No. 35 at 21.  Rather, the evidence shows that while Brown did make a commitment, in

essence, to put its finger on the admissions' scale for Plaintiffs, Brown fulfilled its obligations under the agreements – providing Recruited Plaintiffs with a "Likely Letter" and Supported Plaintiffs with support in the admissions process. Plaintiffs agreed to this assistance and Brown fulfilled that agreement. As for Coach leGassick's statements while talking with prospective recruits using the word "varsity" or referencing four years, such statements were at best aspirational, and "do not rise to the level of enforceable contractual terms." ECF No. 32 at 23. Observing the language and context of the recruitment agreements, the Court agrees that Plaintiffs are unlikely to demonstrate any further obligations on the part of Brown.

In sum, Plaintiffs' breach of contract claim survives Brown's Motion to Dismiss but is not likely to succeed on the merits.

### b. Promissory Estoppel (Count II)

Plaintiffs argue that even if the recruitment agreements did not give rise to an enforceable contract, Brown should still be estopped from transitioning the squash team based on the promises made during the recruitment process. ECF No. 14 at 22-23. Brown moves to dismiss the claim, arguing that it is barred by Plaintiffs' allegations of consideration, and, regardless, its "alleged promise of 'the ability to compete on the school's varsity squash teams' was neither clear nor unambiguous." ECF No. 32 at 28.

Under Rhode Island law, promissory estoppel requires: "1. A clear and unambiguous promise; 2. Reasonable and justifiable reliance upon the promise; and

3. Detriment to the promisee, caused by his or her reliance on the promise." *Cote v. Aiello*, 148 A.3d 537, 547 (R.I. 2016) (quoting *Filippi v. Filippi*, 818 A.2d 608, 626 (R.I. 2003)).   Plaintiffs claim that they meet all three requirements, as they reasonably relied on Brown's promise of varsity squash opportunities to their detriment, by matriculating at Brown and forgoing opportunities at other universities. ECF No. 14 at 22.

*Motion to Dismiss*

Brown's Motion to Dismiss Plaintiffs' claim fails for two reasons.   First, Plaintiffs' allegations of consideration for a contract do not preclude their promissory estoppel claim. *See, e.g.*, *Cappalli v. BJ's Wholesale Club, Inc.*, No. CA 10-407-S, 2011 WL 2606912, at *3 (D.R.I. June 30, 2011) ("[E]ven if an express contract did exist between the parties, it is permissible under Rhode Island law to plead an equitable cause of action in the alternative where an express contract exists.").   While courts in Rhode Island have "often declined the invitation to address arguments or claims based on a theory of promissory estoppel when an enforceable contract exists between the parties," *Andrews v. Lombardi*, 231 A.3d 1108, 1130 (R.I. 2020), this trend is insufficient reason for dismissing the claim at this stage of the litigation.   Pleading conflicting causes of action early in litigation is an acceptable action under the civil rules. *Limone v. United States*, 579 F.3d 79, 93 (1st Cir. 2009) ("The plaintiffs had the right to plead alternative theories of liability, *see* Fed.R.Civ.P. 8(d), and their exercise of that right did not debar them from an independent review of each set of

12

claims.") (citing *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1157-58 (1st Cir. 1989)).

Brown's second argument – that its alleged promise is neither clear nor unambiguous – similarly fails. Like the analysis of Plaintiffs' breach of contract claim, this Court cannot determine the character of Brown's alleged promise as a matter of law. Plaintiffs have adequately pleaded that Brown made a clear and unambiguous promise to them. *See* ECF No. 14 at 22, ¶110 ("Brown promised Plaintiffs that if they committed to and attended Brown, Brown would provide each of them the ability to compete on the school's varsity squash teams."). Because the Plaintiffs have plausibly alleged promissory estoppel, the Court DENIES Brown's Motion to Dismiss Count II.

*Preliminary Injunction*

After reviewing all the evidence submitted, the Court has concluded that this claim will likely not succeed. Plaintiffs argue that Brown's statements during the recruitment process amounted to a clear and unambiguous promise that they would have the opportunity to play four years of varsity squash at Brown.[2] ECF No. 34 at 35-36. Observing the statements, however, casts doubt on this assertion. Simply, Coach leGassick's communications do not make such a promise – and certainly not

---

[2] Even though they allege Brown committed four years of varsity squash to them, the testimony showed that the recruited students made no commitment to play squash at Brown at all – not for one day or for four years. Trial Tr. vol. 1, 147:20–148:13, 182:16–183:21; Trial Tr. vol. 2, 33:23–34:10. Plaintiffs' claim that Brown made a binding promise to provide four years of varsity squash, while students made no commitment to play at all, strains credibility.

13

clearly and unambiguously. To the extent that he made any promises through the communications, it appears to be more in line with Brown's interpretation –promising support only in the admissions process. *See, e.g.*, ECF No. 35-3 at 6 (email from Coach leGassick to Plaintiff McCarthy: "What this offer means is that we are guaranteeing that we reserve a recruiting spot for you. (We will not change the offer if you accept it. We would not suddenly in mid-October for instance say that we are not going to support you!).")." The Court sees no evidence of a clear and unambiguous promise that Plaintiffs will play varsity squash for four years.

In sum, Plaintiffs' promissory estoppel claim survives Brown's Motion to Dismiss but is not likely to succeed on the merits.

### c. Fraudulent & Negligent Misrepresentation (Counts III & IV)

Plaintiffs next argue that Brown misrepresented its varsity squash opportunities throughout the recruitment process, concealing information that would have been material to their college decisions. ECF No. 14 at 22-23. Brown moves to dismiss this claim, countering that Plaintiffs fail to allege any actual misrepresentations. ECF No. 32 at 30-31.

"To establish a prima facie fraud claim, 'the plaintiff must prove that the defendant made a false representation intending thereby to induce [the] plaintiff to rely thereon and that the plaintiff justifiably relied thereon to his or her damage.'" *Cote*, 148 A.3d at 548 (quoting *McNulty v. Chip*, 116 A.3d 173, 182-83 (R.I. 2015)). Further, "unfulfilled promises to do a particular thing in the future do not constitute fraud in and of themselves." *Id.* Similarly, a prima facie case of negligent

misrepresentation requires "a misrepresentation of a material fact." *Id.* at 549

(quoting *Zarrella v. Minnesota Mutual Life Insurance Co.*, 824 A.2d 1249, 1257 (R.I.

2003)). "Future events or promises are not considered factual." *Id.*

Plaintiffs argue that Brown's misrepresentations began "[a]s early as 2018,"

when "Brown was secretly reassessing the composition of its varsity sports program

and considering cutting sports." ECF No. 14 at 16. They claim that Brown was

obligated to inform recruited students about the internal assessments of its athletics

programs, given that "the 'expected outcome' of the process would be to eliminate a

number of varsity teams." *Id.* According to Plaintiffs, if Brown had disclosed "in 2018

that the school was considering terminating the varsity squash teams, then both the

incoming recruits and current players could have considered pursuing their academic

and athletic careers at other schools." *Id.* at 19.  Further, if Brown had disclosed

earlier in the 2019-20 academic year, "incoming recruits could have pursued potential

recruiting at other schools," and "existing Brown students could have explored

opportunities to transfer to other colleges with varsity squash programs." *Id.* at 19-

20.

However, Brown compellingly cites Plaintiffs' allegations as reason to dismiss

these claims, noting that "Plaintiffs claim they received their recruitment offers

between 2016 and July 17, 2019, and that Brown did not decide to eliminate varsity

squash until after January 2020." ECF No. 32 at 31.  Indeed, the most recent

recruitment offer listed in Plaintiffs' Amended Complaint was made to Plaintiff

Danielle Benstock on July 17, 2019. ECF No. 14 at 9.  Even by Plaintiffs' alleged

timeline, Brown was "expressly looking at which varsity teams to cut as early as January 2020" – nearly half a year after Benstock's offer. *Id.* at 16.

To bolster their claims, Plaintiffs point to communications from Brown Athletics through the Spring 2020 term that did not reference the fact that Brown was considering eliminating the varsity squash teams. ECF No. 14 at 17-18. However, failing to update students on the university's review of athletic programs does not amount to a misrepresentation, given that by all accounts the decision to cut the teams had not yet been made.

Even interpreted in the light most favorable to Plaintiffs, the Amended Complaint fails to sufficiently allege any actual misrepresentations made by Brown. Thus, the Court dismisses Counts III and IV.

### d. Breach of Fiduciary Relationship (Count V)

Finally, Plaintiffs claim that Brown violated its fiduciary duty "by failing to advise them and guide them in a truthful and forthright manner" and concealing material information from them. ECF No. 14 at 24. Brown moves to dismiss the claim, arguing that "[n]o court has ever recognized such a duty." ECF No. 32 at 32.

Under Rhode Island law, a fiduciary duty may arise in a "relationship of trust and confidence," with relevant factors including "the reliance of one party upon the other, the relationship of the parties prior to the incidents complained of, the relative business capacities or lack thereof between the parties, and the readiness of one party to follow the other's guidance in complicated transactions." *Simpson v. Dailey*, 496 A.2d 126, 129 (R.I. 1985). When a fiduciary relationship exists, the fiduciary has a

duty to disclose material facts to the other party. In such a relationship it is a "basic affirmative duty of a fiduciary to disclose to his principal all material facts concerning the transaction with which he is entrusted." *Jerlyn Yacht Sales, Inc. v. Wayne R. Roman Yacht Brokerage*, 950 F.2d 60, 69 (1st Cir. 1991).

Plaintiffs argue that they were in a fiduciary relationship with Brown, based on the trust and reliance they placed in Brown's representatives throughout and following the recruitment process. ECF No. 14 at 15. Further, they argue that Brown violated its fiduciary duty by concealing material information – by not informing them of the possible elimination of the varsity squash teams. *Id.* at 15-18. Brown urges the Court to rule, as a matter of law, that no fiduciary relationship existed here – claiming that "courts in neighboring Massachusetts have held directly that no fiduciary duty [between a university and its students] exists." ECF No. 28 at 32. This Court need not to go so far here because Plaintiffs fail to allege sufficient plausible facts to support a fiduciary duty and breach.

Brown compellingly argues that Plaintiffs are trying to "unilaterally transform their relationship with Brown into a fiduciary relationship simply by alleging they trusted and relied on Brown's statements." ECF No. 32 at 34. Indeed, beyond Plaintiffs' claims of trust and reliance in Brown, they allege no plausible facts showing a fiduciary relationship. Further, were the Court to find that such a relationship existed, Plaintiffs would still face obstacles because they fail to allege plausible facts that Brown violated this duty, given the short timeline between the university's decision to cut the teams and its public announcement.

17

Even interpreted in the light most favorable to Plaintiffs, the Amended Complaint fails to sufficiently allege a fiduciary duty or a breach by Brown. Thus, the Court dismisses Count V.

### B. Irreparable Harm

Even though the request for a preliminary injunction fails because Plaintiffs could not establish likelihood of success on any of their claims, the Court will briefly set forth its reasoning as to why the remaining factors required for a preliminary injunction also have not been established.

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not just that it is "possib[le]." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

Plaintiffs argue that if this Court declines to enjoin Brown, they will suffer a host of irreparable harms. They begin by highlighting anticipated harms to their teams – arguing that "the demotion to the club level would impair the ability of the teams to recruit new players, significantly hamper their ability to raise funds

18

necessary to maintain coaching staff, and reduce overall competitiveness." ECF No. 34 at 43-44. Brown compellingly rebuts each claim – arguing that player recruitment does not typically begin until the spring, and even club sports at Brown have impressive capacities for fundraising and competing in their fields. ECF No. 35 at 14-16. At the very least, these fail to rise to the level of irreparable harm, as later-issued injunctive or monetary relief would likely address these harms, to the extent they might occur.

Plaintiffs then argue they will suffer multiple personal harms in the absence of a preliminary injunction. They point to their inability to compete and train as varsity athletes at Brown as this litigation proceeds. ECF No. 34 at 44-45. However, because of the COVID-19 pandemic, intercollegiate squash events for the season have largely been cancelled. *See, e.g., Ivy League Outlines Intercollegiate Athletics Plans; No Competition in Fall Semester*, Ivy League (July 8, 2020), https://ivyleague.com/news/2020/7/8/general-ivy-league-outlines-intercollegiate-athletics-plans-no-competition-in-fall-semester.aspx. The pandemic has also significantly constrained the possibilities for varsity athletes to train, as Brown cancelled all in-person sports practice activities beginning on November 15, 2020. ECF No. 35 at 16-17. While remote "physical conditioning and mental team-building" opportunities may still be possible, Plaintiffs have not identified any that they would be unable to do as club, rather than varsity, athletes. ECF No. 34 at 44-45.

Finally, Plaintiffs claim that their status as club student-athletes will irreparably harm their prospects as applicants to graduate schools and jobs after

Brown, as well as their ability to serve as varsity athlete volunteers for the Squashbusters program. *Id.* At 45. However, beyond references to the prestige of varsity athletics, Plaintiffs failed to demonstrate with any specificity how such harms might occur. To the contrary, even as club athletes, Plaintiffs appear to be well-equipped to succeed in their post-graduate pursuits and remain free to volunteer for Squashbusters (as much as possible during this pandemic).

In sum, Plaintiffs have failed to point to any viable irreparable harms that they would suffer in the absence of immediate injunctive relief.

### C. Balance of Hardships

Plaintiffs argue that the balance of hardships falls in their favor, claiming that without an injunction they will face irreparable harm while "little or no harm will befall Brown if an injunction issues." ECF No. 34 at 46. For the reasons stated above – that the pandemic has effectively halted intercollegiate athletic training and competition – Plaintiffs' hardships in the absence of an injunction appear minimal. In contrast, an injunction would "undermine the new alignment of teams that Brown has determined for its athletics program as a whole." ECF No. 35 at 34. On balance, this appears to be a greater hardship than any that Plaintiffs may face absent an injunction as this litigation proceeds.

### D. Public Interest

Finally, Plaintiffs argue that the public interest favors an injunction because of their involvement with Squashbusters, a program through which they mentor and support Providence middle and high school students. ECF No. 34 at 48-49. This

20

Court disagrees.  Admittedly, Plaintiffs point to the unique benefits that mentees experience when working with varsity athletes, as well as the benefits that such partnerships have on program fundraising.  *Id.* at 49.  However, many of these benefits – mentees "receive on-court training from accomplished players and attend varsity squash matches" and "potential donors get the opportunity to play squash with varsity players" – only apply to squash teams playing in-person.  *Id.*  As this litigation proceeds, Plaintiffs may still volunteer, and provide support and opportunities to their mentees, as club athletes.  Further, declining to enjoin Brown advances the public interest in allowing educational institutions to plan and control their academic and extracurricular programs.

## V.    CONCLUSION

Because Plaintiffs have failed to meet the necessary factors for preliminary injunctive relief, this Court DENIES Plaintiffs' Motion for Preliminary Injunction. ECF No. 16.  The Court GRANTS Brown's Motion to Dismiss Counts III, IV, and V charging fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary relationship and DENIES the Motion to Dismiss as to Counts I and II alleging breach of contract and promissory estoppel.  ECF No. 32.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

January 14, 2021